NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Argued February 8, 2018
Decided March 19, 2018

### Before

JOEL M. FLAUM, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

| | |
|---|---|
| No. 17-2584 <br><br> JASTI RAO, <br>     *Plaintiff-Appellant,* <br><br> *v.* <br><br> SARA RUSCH, *et al.*, <br>     *Defendants-Appellees.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. <br><br> No. 14 C 66 <br> Virginia M. Kendall, *Judge.* |

### Order

Until March 2013 Jasti Rao directed the cancer research center of the University of Illinois College of Medicine at Peoria. During 2012 other researchers accused Rao of misrepresenting images and other facts in published papers, and at least one member of the Center accused Rao of demanding a kickback in exchange for retaining his job and immigration status. Sara Rusch, the Regional Dean for the College of Medicine's Peoria campus, formed a committee to investigate. The committee thought some of the allegations against Rao supported and deemed further investigation essential. This led to the involvement of Dimitri Azar, Dean of the College of Medicine; Mark Grabiner, the University's Research Integrity Officer; and Donna McNeely, the University's Ethics Of-

ficer. They in turn hired the corporate-investigations group at Kaye Scholer (since 2016 Arnold & Porter Kaye Scholer LLP) to perform a thorough inquiry.

That inquiry lasted from September 2012 to March 2013. On March 21, 2013, two of Kaye Scholer's lawyers, plus a lawyer from the University's outside labor-law firm, met with Rao and his lawyer Jeffrey Rock to review their findings. Kaye Scholer told Rao and Rock that the investigation had sustained the kickback charge (it even had Rao on video demanding an envelope full of cash) and the research-misconduct charge, at least to the extent that Rao had destroyed material evidence. Kaye Scholer told Rao that, unless he resigned within four days, the University would begin proceedings to revoke his tenure. It added that resignation might allow him to salvage some of his reputation, while formal tenure-revocation proceedings would bring everything into the open. Finally, Kaye Scholer stated that Rao was forthwith on administrative leave (with pay) and for the time being would lose access to the University's campus and computers, to prevent further efforts to tamper with evidence. Kaye Scholer's representations about Rao's status and prospects had been approved by senior officials of the University.

Rao resigned, after discussing the situation with his children, both of whom are lawyers, and with Rock. He concedes knowing that his contract, and the University's internal rules, entitled him to a hearing if he chose to fight the charges. A year later he filed this suit under federal employment-discrimination laws plus 42 U.S.C. §1983, forfeiting any confidentiality benefits of the resignation. The district court dismissed parts of his complaint and granted summary judgment to the defendants (often "the University" for short) on all other parts except Count IX. See 2014 U.S. Dist. LEXIS 151105 (N.D. Ill. Oct. 23, 2014); 2017 U.S. Dist. LEXIS 160219 (N.D. Ill. Jan. 11, 2017); 2017 U.S. Dist. LEXIS 86152 (N.D. Ill. June 5, 2017). The last of these opinions is the most comprehensive, and it lays out the events in greater detail than we need to do. After the opinion of June 5, 2017, what remained for trial was Rao's claim that the University violated his rights under the Due Process Clause of the Fourteenth Amendment by constructively discharging him without a hearing. The jury returned a verdict in favor of all defendants, and Rao has appealed from the final decision.

Rao's appellate lawyer created an unnecessary procedural snarl by stating in the notice of appeal that Rao would contest seven specific interlocutory rulings by the district court. All would have been well if the appellate brief had been confined to those orders. But instead Rao's brief ignored four of them while contesting other rulings that had been omitted from the list. This led the University to request dismissal of the appeal for lack of jurisdiction. And it is true that an appeal from one order does not authorize appellate review of a different order. *Goulding v. Global Medical Products Holdings, Inc.*, 394 F.3d 466, 467 (7th Cir. 2005). But it is also true that an appeal from the final decision in a

case permits the appellant to contest *all* prior orders that affected the final decision. *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621, 626 (7th Cir. 1993); *Alejo v. Heller*, 328 F.3d 930, 935 (7th Cir. 2003). Rao appealed from the final decision, the document wrapping up the entire case. The remainder of his notice of appeal is surplus, which we disregard. Cf. *Foman v. Davis*, 371 U.S. 178 (1962). Our jurisdiction is secure.

This is, however, as far as Rao gets. The bulk of the adverse decision—the district court's long opinion of June 5, 2017, granting summary judgment to the defendants on almost all of Rao's theories—gets less than four pages of attention in his appellate brief. Pare away the boilerplate (such as a recitation of the standard for granting summary judgment) and a recap of Rao's claims, and less than two pages remains. Those two pages do not present either evidence or argument. Instead we have sentences such as: "First, Rao raised, in response to Defendants' Motion for Summary Judgment, sufficient evidence to show that he was treated less favorably than others outside of his protected class who were not Indian". That's Rao's bottom line, to be sure, but a brief must do more than state conclusions. What facts does Rao rely on for this proposition? He does not tell us. Rao has thus forfeited appellate review of the district court's summary-judgment order.

Rao has preserved for our review some objections to the district judge's rulings on evidence at trial and one to a jury instruction.

The questions for trial were (a) whether the suspension (with pay but without access to campus or computers) amounted to a constructive discharge, and (b) whether the University coerced Rao to resign by making it clear that it would press criminal charges or smear him if he demanded a hearing. The University responded to the constructive-discharge theme by contending that suspension with pay is normal in ethics investigations and appropriate when the employer is worried about the destruction of evidence, so that Rao had not been discharged under the standard of *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). The University also insisted that Rao could have had a hearing for the asking and that whether any more serious consequences would ensue would depend on the outcome of the hearing. The jury had to determine who was right about these matters.

At the trial, however, Rao sought to explore at length whether particular defendants, or other officials of the University, believed the charges made against him, whether the lab worker who initially charged Rao with demanding a kickback was credible, whether Kaye Scholer performed its investigation competently, whether Rao needed money to support a gambling habit (the reason Kaye Scholer thought he had set out to extort kickbacks), and so on.

Rao challenges two of the district court's evidentiary decisions: one curtailed his ability to explore as part of his case in chief what Thomas Santoro (one of three members of Regional Dean Rusch's committee) believed and why he believed it (he calls this "state of mind" evidence), and the second curtailed his opportunity to impeach Rusch about what she had said to Santoro and another member of the committee about why she formed the committee. Given Fed. R. Evid. 403, which permits district judges to curtail inquiries into collateral matters, the rulings that Rao now contests are not problematic. The district judge allowed Rao's lawyer to put before the jury a good deal of evidence about the merit of the charges against him, how the University investigated them, and what other members of the faculty believed. But the trial was not about those subjects. The judge was not obliged to let counsel turn a trial about constructive or coerced discharge into an inquest about who within the University believed which particular allegations, and when.

As for the jury instruction: here Rao's arguments are at least pertinent. The instruction in question told the jury that a defendant who denied knowledge of certain events still could be liable under the Constitution for assuming a head-in-sand posture. Rao proposed a wilful-blindness instruction to tell the jury that Rusch and Azar could be culpable for a constructive or coerced discharge even though neither was present when Kaye Scholer gave Rao the bad news. Rao now contends that this instruction was not worded correctly; defendants say that it was.

Here is the material part of the instruction:

> A defendant knowingly deprives another of his right to due process when he or she was either personally involved in the conduct that the plaintiff complains about, or when he or she sets in motion a series of events that he or she knew or reasonably should have known would cause others to deprive the plaintiff of his right to due process.

> A defendant can be personally involved if he or she knows about the conduct and facilitates it, approves it, condones it, or turns a blind eye to the conduct for fear of what he or she might see.

Rao maintains that this was defective because it limits wilful blindness to knowledge of a person's property interest (here, Rao's tenure), which was not contested. But that's not what the instruction says. It lists ways in which a person can be "personally involved" in, and hence responsible for, conduct that violates the Constitution. Neither the language we have quoted nor any other part of the instructions says or implies that knowledge (or deliberate ignorance) is relevant to the existence of a property interest

alone. The reference instead is to the entire "series of events that [Rusch or Azar] knew or reasonably should have known would cause others to deprive [Rao] of his right to due process."

AFFIRMED